UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL NO. 07-007 (GK) |
| | : | |
| v. | : | |
| | : | |
| ANDRE DREW, | : | |
|     Defendant | : | |
| | : | |

GOVERNMENT'S OPPOSITION TO DEFENDANT'S
MOTION TO SUPPRESS IDENTIFICATION TESTIMONY

The United States Attorney, by and through its attorney, the United States Attorney for the District of Columbia, respectfully opposes the defendant's Motion to Suppress Identification Testimony. As grounds for this opposition, the United States relies on the following points and authorities and such other points and authorities as may be cited at a hearing on the motion.

I.     PROCEDURAL BACKGROUND

On January 31, 2007, a federal grand jury indicted the defendant, Andre Drew, on one count of Enticing a Minor in Sexual Conduct for the Purpose of Production, in violation of 18 U.S.C. § 2251(a) (Count One); two counts of First Degree Child Sexual Abuse, in violation of D.C. Code § 22-3008 (Counts Two and Three); and one count of Second Degree Child Sexual Abuse, in violation of D.C. Code § 22-3009 (Count Four). Upon the grand jury indicting the defendant in this Court, the government moved to dismiss without prejudice the pending action in the Superior Court for the District of Columbia.[1]

---

[1] The defendant had been indicted in the Superior Court on February 22, 2006, on fourteen counts of First and Second Degree Child Sexual Abuse (with Aggravating Circumstances) and Use of a Minor in a Sexual Performance for conduct involving three adolescent boys under the age of 16, including D.B., the victim in this case. Due to one mutually requested continuance and other continuances requested by the defendant or necessitated by his requests for new counsel, the trial in Superior Court did not commence as scheduled. When the

II.     FACTUAL BACKGROUND

On December 10, 2005, 13-year-old A.B. called 911 and reported that he, and a 12-year-old male friend, D.B., had been abducted at gunpoint in front of Dunbar High School in the District of Columbia.  A.B. said that they were taken to 135 P Street, N.W., to a room on the second floor, whose door was the first one on the left.  There, he claimed that they were forced to perform oral and anal sex on each other while their abductor took photographs.  However, upon further questioning, A.B. admitted that he had not been abducted, but he maintained that a man that he knew for three years, named Andre Thomas Drew, took pictures of him and D.B. engaged in sex in the room located at 135 P Street, N.W.  A.B. explained that the defendant offered to pay him and D.B. $500 each if they engaged in sex so that the defendant could take pictures of them.  They agreed and about one month earlier (sometime in November 2005), they went to the defendant's room at 135 P Street, N.W., where they engaged in sex while the defendant took pictures.  A.B. said that he called the police on December 10, 2005, because the defendant was going to mail the sexually explicit photograph's to A.B.'s mother.

A.B. showed the police the defendant's room and he gave them a physical description of the defendant and the defendant's car.  As A.B. was being taken to the police station, A.B. saw the defendant drive by in his car and he pointed the defendant out to an officer.  The car was stopped and A.B. identified the defendant -- the sole occupant of the vehicle -- as the person who took the sexually explicit pictures of him and D.B.

The defendant was taken back to 135 P Street, N.W., where he verbally and in writing

---

last trial date, December 6, 2006, was continued because the defendant requested new counsel on the eve of trial, the government considered removing the case to federal court. Realizing that the were grounds for a federal action, it indicted the case in this Court in less than sixty days.

consented to a search of his room. After he verbally consented to the search, but before he signed the form, the defendant handed a police officer a brown folder, stating "this is what you are looking for," or words to that effect. The officer, who previously had seen the folder, told the defendant that he should wait until he signed the consent form. The defendant signed the form and the police retrieved the brown folder, which contained photographs of A.B. having anal and oral sex with an adolescent male, later identified as D.B. These photographs had the background cut away from the figures.

During that investigation, the police also realized that A.B. was one of the boys in a set of sexually explicit photographs that a local CVS had given to the police in November 2005, and that the defendant was the man on the surveillance videotape submitting the film for processing and attempting to retrieve the prints. The name printed on the film processing envelope was "Thomas Caclin" and the telephone number listed was 410-320-2158.[2]

The defendant was arrested and transported to the police station. There, he was read his Miranda rights and he signed a waiver of those rights agreeing to speak to the police without an attorney. During that interview, the defendant told the police that he took the pictures that were developed at CVS. He said that about a month before his arrest, he took the pictures of the boys engaging in oral and anal sex inside his room at 135 P Street, N.W. He said that he submitted the film for processing, but the store would not allow him to pick up the prints. The defendant identified the boys in the CVS photographs by their first names, which are consistent with the names of A.B. and D.B.

---

[2] Further investigation revealed that the telephone number listed on the CVS film processing envelope was only one digit off from the defendant's actual telephone number, 410-370-2158, which D.B. said he used to contact the defendant.

About five days after the defendant was arrested, the police interviewed 12-year-old D.B. He told the police that he knew "Thomas" for about three years and had sex with him on a number of occasions. D.B. said that sometimes, after they had sex, "Thomas" gave him money. D.B. also said that "Thomas" had sex with A.B. When asked about the CVS pictures, D.B. stated that "Thomas" asked A.B. and D.B. to have sex with each other while he took pictures of them. "Thomas" promised to pay them $500 each for the pictures, but he did not pay them. D.B. also corroborated A.B.'s claim that "Thomas" intended to send the sexually explicit pictures to A.B.'s mother. D.B. said that he saw the card containing the pictures in "Thomas'" car.[3] He also told the police that "Thomas" bought him a dirt bike; helped him to concoct a phoney school fund raising scheme in which D.B. would keep the money;[4] allowed him to play video games; showed him pornography; and gave him marijuana and alcohol to consume. D.B. said that he spent the night with "Thomas" and had sex with him as recently as one month before being interviewed. On December 19, 2005, about four days after the police interviewed D.B., they showed him a single photograph of the defendant. Without hesitation, D.B. stated, "yes, that's him," identifying the defendant as the person that he knew as "Thomas."

III.   LEGAL ANALYSIS

The defendant moves to suppress A.B.'s and D.B.'s out-of-court identifications of him, arguing that the particular identification procedure that was used increased the chance that he was

---

[3] When the defendant was stopped on December 10, 2005, the sexually explicit card was found in the defendant's car. The pictures in the brown folder that the defendant gave to the police during the consent search of his room, appear to have been used to produce that card.

[4] Copies of the fund raising flyers were recovered from the brown folder that the defendant handed to the police during the consent search of his room.

4

misidentified in violation of his due process rights.  Specifically, he contends that (1) showing A.B. and D.B. only a single photograph was so unduly suggestive that it rendered the identifications inadmissible; and (2) the victims' young age, and other unspecified factors, rendered the identification process unreliable.  See Mot. Suppress at 3-4.  The defendant's position, however, is not supported by the law, which recognizes that an identification based on a single photograph may be sufficiently reliable to satisfy due process where the witness knows the suspect.

To determine whether an out-of-court identification is admissible, a trial court typically engages in a two-step inquiry: it decides (1) whether the identification procedure "was impermissibly suggestive," see United States v. Washington, 12 F.3d 1128, 1134 (D.C. Cir. 1994), and if so, (2) whether under the totality of the circumstances, the identification is still sufficiently reliable to preclude "a very substantial likelihood of irreparable misidentification."  See Manson v. Braithwaite, 432 U.S. 98 (1977) (citations omitted); see also Maddox v. United States, 745 A.2d 284, 292 (D.C. 2000) (citations omitted); Holt v. United States, 675 A.2d 474, 482 (D.C. 1996) (citations omitted).  The Court's reliability analysis focuses on five factors: (1) the opportunity of the witness to view the defendant during the crime; (2) the witness' degree of attention directed at the criminal; (3) the accuracy of any prior description of the criminal; (4) the level of certainty that the witness demonstrates when making the identification; and (5) the time that has elapsed between the crime and the identification.  See Washington, 12 F.3d at 1134 (citations omitted).

    A.  The Identification Procedures Were Not Unduly Suggestive.

First, the identification by A.B. did not involve a photograph as the defendant alleges.

See Mot. Suppress at 2.  Rather, A.B.'s identification of the defendant was equivalent to a second-sighting, free from any allegedly suggestive police procedures.  A.B. saw the defendant drive by in his car as A.B. was being taken by a detective to the police station.  A.B. pointed out the defendant to the detective and identified him as the person with whom A.B. had sex and the person who photographed A.B. having sex with another adolescent boy.  Because the defendant was driving along a public street when A.B. identified him, and he was not in police custody, there was no identification procedure being conducted by the police that can now be challenged as tainted by their actions.[5]  Accordingly, the defendant's motion to suppress A.B.'s identification of him should be denied without considering whether it is otherwise reliable under the totality of the circumstances.

Showing D.B. a single photograph of the defendant also was not an unduly suggestive identification procedure.  The government agrees that a single photograph can, under some circumstances, be unduly suggestive.  However, the use of a single photograph is not *per se* invalid where the witness is familiar with the suspect.  In Green v. United States, 580 A.2d 1325, 1327 (D.C. 1990), the District of Columbia Court of Appeals stated that the "likelihood of undue suggestivity is present only in situations where the perpetrator of the crime *is a stranger* to the witness and the latter is asked to make an identification on the basis of a single photograph or by confrontation with a suspect in handcuffs or in a holding cell."  See id. (emphasis added).  The defendant was far from a stranger to D.B.

---

[5] After the defendant was stopped and was standing outside of his car, A.B. confirmed his identification of the defendant.  The mere custody of a suspect, however, does not render an identification unduly suggestive, see e.g., Garris v. Untied States, 559 A.2d 323, 327 (D.C. 1989), especially, as is the case here, where the person viewing the suspect previously identified him.

6

D.B. told the police that he knew "Thomas" for about three years. D.B. knew where "Thomas" lived and said that he had been to "Thomas'" home at 135 P Street, N.W., the defendant's address, more than once. D.B. also told the police that "Thomas" gave him money and other gifts; that he had ridden in "Thomas'" car; and that "Thomas" had taken him on outings. D.B. even knew intimate details about "Thomas'" and had slept at his home. D.B. had sex with "Thomas" and saw him having sex with other boys. D.B. also had seen "Thomas" within the last thirty days because he had sex with him. In this context, where D.B. obviously knew the defendant intimately, showing him a single photograph did not increase the likelihood that D.B. would misidentify the defendant.[6]

B. The Identifications of the Defendant Are Reliable.

But even assuming that A.B.'s second-sighting, and D.B.'s identification based on a single photograph, were unduly suggestive, the totality of the circumstances demonstrates that there was little chance of misidentification. In Washington, the United States Court of Appeals for the District of Columbia Circuit found reliable the out-of-court identifications made by two police officers of a suspect based on a single photograph. See Washington, 12 F.3d at 1134. In so holding, the Court found compelling that one of the officers knew the defendant from prior community contacts, one officer had ample opportunity to see the defendant during a car chase,

---

[6] The defendant relies on United States v. Rattler, 475 F.3d 408 (D.C. Cir. 2007), to suggest that single photograph identification procedures are unduly suggestive, as a matter of law. See Mot. Suppress at 2-4. He is mistaken. First, the Rattler court did not rule on the suggestivity issue, see id. at 414, and thus the holding in the case cannot be read to establish a *per se* rule of suggestivity for single photograph identification procedures. Second, Rattler is inapposite because the witnesses in that case had no prior contacts with, and did not know, the suspect until he robbed their respective banks. Compare, Rattler, 475 F.3d at 414 with Green, 580 A.2d at 1327.

and both officers identified the defendant without hesitation.  Id.

  Likewise, the Court of Appeals has upheld an out-of-court single photograph identification where the witness knew the suspect.  In Green, the eyewitness was asleep when the defendant entered the apartment with a gun, killed the eyewitness's mother, and shot the eyewitness in the back.  The eyewitness identified the shooter as Green, his mother's former lover who had lived in their apartment for six months and who was Jamaican.  The police obtained a photo of Green and showed it to the eyewitness who positively identified the suspect.  Finding the identification reliable, the Court of Appeals commented that the eyewitness had lived with the defendant for several months, knew his name and background, and described him to the police weeks before he saw the photograph.  See Green, 580 A.2d at 1327.

  Here, A.B. and D.B. knew the defendant five times longer than the witness knew the suspect in Green.  They also had observed the defendant under more reliable circumstances than the witnesses in Green and Washington.  Whereas the witness in Green was shot in the back after being awakened from sleep, and the officers in Washington were involved in an ongoing car chase, A.B.'s and D.B.'s observations of the defendant were not based on single startling events.  Rather, they saw the defendant on multiple occasions under a variety of circumstances, including intimate sexual acts between them.  Unlike the witnesses in Green and Washington, the frequency and character of A.B.'s and D.B.'s contacts with the defendant provided them with a much better opportunity to focus on and become familiar with the defendant before they were asked to identify him.  This case, thus presents an even more compelling set of factual circumstances on which to find reliability than the courts found acceptable in Washington and

Green.[7]

Finally, the defendant asserts, without elaboration, that A.B.'s and D.B.'s age undermines the reliability of the their identifications of him.  See Mot. Suppress at 4.  Although A.B. and D.B. are both juveniles, at 13 and 12 years of age respectively, neither one is so young that his age caused a substantial likelihood of an irreparable misidentification.  To the contrary, both boys' ability to provide the police with substantial details about the defendant and their interactions with him suggest that their age had no impact upon their ability to accurately identify the defendant.

Accordingly, there being no factual or legal basis on which to conclude that A.B.'s or D.B.'s out-of-court identifications of the defendant were unduly suggestive or are otherwise

---

[7] Rattler, which the defendant cites, also supports the government's position that the out-of-court identifications in this case are admissible because they are otherwise reliable.  In Rattler, the Court found each out-of-court identification reliable because of the same factors that are present in this case, namely one witness' prior contacts with the suspect, the witnesses ample opportunity to observe the suspect, their prior spot on descriptions of him, and their ability to identify him without hesitation.  Rattler, 475 F.3d  at 414

unreliable, the defendant's motion should be denied.[8]

                                          Respectfully submitted,

                                          JEFFREY A. TAYLOR
                                          UNITED STATES ATTORNEY

By: _____
       JULIEANNE HIMELSTEIN
       DENISE A. SIMMONDS
       Assistant United States Attorney
       555 4th Street, N.W.
       Washington, D.C. 20001
       (202) 353-8077

---

[8] The defendant requests that all out-of-court identifications made by "any" witness be suppressed, but his motion refers only to A.B. and D.B. See Mot. Suppress at 1-2. Insofar as the defendant also meant to include the identification made by 15-year-old T.S., among the testimony to be suppressed, the government contends that the motion should be denied as to that identification for the same reasons that apply to D.B.'s identification.

CERTIFICATE OF SERVICE

    I HEREBY CERTIFY that a copy of the foregoing was served by mail upon the attorney for the defendant, Danny Onorato, Schertler & Onorato, 601 Pennsylvania Avenue, N.W., North Building, 9th Floor, Washington, D.C. 20004, on this _____ day of April 2007.

_____
JULIEANNE HIMELSTEIN
DENISE A. SIMMONDS