UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | Criminal No. 07-007 (GK) |
| | ) | |
| v. | ) | |
| | ) | |
| ANDRE DREW | ) | |
| | ) | |

**GOVERNMENT'S OPPOSITION TO
DEFENDANT'S MOTION TO SUPPRESS EVIDENCE &
SUPPLEMENTAL STATEMENT OF POINTS AND AUTHORITIES**

The United States, by and through its attorney, The United States Attorney for the District of Columbia, respectfully opposes the defendant's Motion to Suppress Tangible Evidence and Supplemental Statement of Points and Authorities. For the reasons stated at the hearing held on May 1, 2007, and set forth below, the defendant's motion should be denied.

I.  BACKGROUND

The government respectfully incorporates herein the statement of facts set forth in its original opposition to the defendant's Motion to Late File a Motion to Suppress Tangible Evidence and Statements, which the government treated as a substantive motion. In addition, the government relies on the facts stated in the Affidavit In Support of the Search Warrant for 135 P Street, N.W., that was issued by the Superior Court of the District of Columbia, when this matter was pending before that Court. See Attachment A.

II.  LEGAL ANALYSIS

The defendant seeks to exclude from evidence at trial items that his brother provided to the government pursuant to a subpoena *duces tecum*. That subpoena was issued after the government executed a search warrant at the defendant's residence and learned that its contents

had been cleaned out by the defendant's brother, at the defendant's request, subsequent to his arrest. The defendant takes the position that but for two prior unlawful searches of his residence that preceded his arrest, the police would not have known about the items that it eventually sought to obtain pursuant to the search warrant and the subpoena. Those items are therefore the fruit of the poisonous prior unlawful searches and must be excluded under the Fourth Amendment. See Def.'s Mot. Suppress & Supp. at 3-5.

The defendant's view is contrary to prevailing law and should be rejected. Indeed, in Wong Sun v. United States, 371 U.S. 471 (1963), the Supreme Court rejected the "but for" analysis that the defendant urges to support his request for exclusion of the evidence, stating that:

> We need not hold that all evidence is "fruit of the poisonous tree" simply because it would not have come to light but for the illegal actions of the police. Rather, the more apt question in such a case is "whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.

Id. at 487-488 (citations omitted). Here, the collection of evidence from the defendant's brother is sustainable on three separate grounds: independent source, inevitable discovery and attenuation.

First, the exclusionary rule does not prohibit the use of evidence for which there is a source that is independent of the unlawful search. See Murray v. United States, 487 U.S. 533 (1988). If the police discover evidence during an unlawful search and then again during a lawful search with a warrant, but information gained during the first search neither prompted the decision to seek a warrant nor influenced the decision to issue the warrant, the evidence is admissible. See Murray, 487 U.S. at 542; see also United States v. Halliman, 923 F.2d 873, 880

(D.C. Cir. 991).

As stated at the May 1 hearing, the government believes that there was one unlawful search and two lawful searches of the defendant's room located at 135 P Street, N.W.[1] The initial, or unlawful, search involved a police officer who opened a brown folder while interviewing the child complainant and therein he saw sexually explicit photographs of the child complainant. The defendant subsequently consented both verbally and in writing to a search of his room that resulted in the recovery of the same brown folder (which the defendant handed over before the search could commence) and certain flyers created by the defendant and given to his child victims to assist them with a fraudulent money-making scheme, personal papers, and cut out computer lettering, some of which the defendant apparently used to make a card that the defendant was going to use to out A.B.'s sexual orientation to his mother because he thought A.B. stole money from him. The government has conceded that it will not seek to use any of the items recovered in the second-consent search. Notwithstanding that it believes that the second-consent search was lawful, the government will not use the items recovered because that lawful search essentially yielded the same items that had been seen in the first unlawful search. The third search of the defendant's room was conducted pursuant to a search warrant that was based on probable cause to believe that the defendant's room contained evidence of "ongoing sexual assaults against young boys." See Appendix A, Aff. in Support of Search Warrant at 1. When

---

[1] The government does not concede, but it also does not address in its opposition the defendant's "cat out of the bag" theory because the government's grounds for admissibility of the evidence does not depend on whether there was one or two illegal searches on December 10, 2005, since the same evidence was found in both searches. The government respectfully requests that it be permitted to respond to this argument at any further hearing on the defendant's motion if the Court believes that the number of searches is germane to its ruling.

that warrant was executed the defendant's room was empty because he had directed his brother to clean it out. The government then obtained the items that the defendant seeks to suppress via subpoena issued to the defendant's brother.

It is apparent from the face of the Affidavit that the request for the search warrant was not based on any items that the police observed while conducting the initial or consent search of defendant's room. The basis for the Affidavit is the investigation into the taking and printing of the CVS pictures that the police obtained about one month before the defendant's arrest. There is no indication that the police saw the motorbike in the room, in fact the warrant states that it was first observed in plain view in the defendant's truck. Additionally, many of the items sought in the warrant are of a type typically looked for in sexual abuse and exploitation cases and are not unique or peculiar to observations made in the defendant's room. For instance, as stated in the Affidavit, it is the sworn officer's experience that pornography, computers, cameras, electronic storage devices, typically are possessed by individuals who abuse children. The warrant also seeks "other evidence relating to" child sexual abuse because the police did not know what was in the room that upon inspection might be relevant. The Affidavit thus demonstrates that it was not the officer's particularized observations of items in the defendant's room that provoked him to seek a warrant.

Moreover, the Affidavit for the search warrant did not rely on any information or items obtained or viewed during the initial entry into the defendant's room or the consent search of it. Instead, the search warrant was based on sexually explicit pictures and video surveillance that a local CVS drug store turned over to the police in November 2005, nearly one month before the searches that took place on December 10, 2005. Once the police were called to the defendant's

residence on December 10th, they realized that the complainant, A.B., was one of the boys in the CVS pictures. Upon further investigation, the police learned the identity of the second boy in the CVS pictures, D.B., and they spoke to him, learning additional information that caused them to believe that the defendant was not just photographing these boys, but that he was sexually abusing them and possibly sexually abusing other boys. That information led the police to speak to yet a third boy, T.S., whose information further expanded what the police knew about the defendant's conduct with the boys and it corroborated what A.B. and D.B. had told them. Based on the results of its nineteen day investigation that post-dated the initial and consent searches of the defendant's room, the police applied for a search warrant seeking evidence concerning an "ongoing pattern of sexual assaults against young boys." None of the information on which the Superior Court found probable cause to issue the search warrant was obtained due to the police entry or search of the defendant's room on December 10, 2005. If the Superior Court judge did not know of any evidence that allegedly was acquired unlawfully, that judge could not have relied upon it in issuing the warrant, and the evidence that would have been secured by that search warrant, but for its removal by the defendant's brother, meets the Murray test.

    Second, for the same reasons, the evidence is admissible because inevitably, it would have been discovered. The police already had the CVS photographs and video surveillance and were in the process of investigating that information to try to identify the boys involved and the man who submitted the photographs for processing. Within a short time of interacting with A.B., on December 10, 2005, the police realized that he was one of the boys depicted in the CVS photographs. Not long thereafter, the defendant admitted that he took those photographs and his identity was confirmed when the detective viewed the surveillance tape. At this point, arguably

the police had probable cause to arrest the defendant for taking the CVS pictures and to request a warrant based on that information. See, e.g., United States v. McMillian, 898 A.2d 922, 941 (D.C. 2006) (taint from illegal Terry stop dissipated where probable cause was developed within minutes of illegal stop based on tip from bus driver that led to discovery of a gun). However, the police sought even further information concerning the production of those pictures before seeking a warrant. Five days later, on or about December 15, 2005, the police spoke to D.B. the other boy depicted in the photographs and learned that the defendant had been having oral- and anal-genital contact with these boys. The police also located and interviewed T.S., confirming not only what A.B. and D.B. said, but learning additional facts about the defendant's interactions with the boys. Based on all of this information, which had nothing to do with the initial or consent searches, the police were entitled to seek a search warrant for the defendant's home, and other locations connected to him – as they ultimately did in this case – and the evidence that the defendant seeks to exclude would have been discovered. See Nix v. Williams, 467 U.S. 431, 443-44 (1984) (societal interest in deterring police misconduct and allowing jury to hear all probative evidence of crime are properly balanced by putting police in same, not worse, position than they would have been had no error or misconduct occurred) (citation omitted); Murray, 487 U.S. at 542-44 (remanding case essentially for determination of whether police would have sought a warrant if they never had unlawfully entered warehouse where marijuana was observed in plain view).[2]

---

[2] In this case, the facts are more compelling than in Murray where the unlawfully viewed evidence - bales of marijuana - was obviously illegal. In this case, the evidence at issue is not plainly illegal on its face thus reducing even further the potential for the passing viewing of such evidence to have infected a lawful later search.

6

Finally, the initial and consent searches of the defendant's room were sufficiently attenuated to the recovery of the evidence that the defendant seeks to suppress to dissipate any alleged taint that might have resulted from either or both of those searches. See Wong Sun, 371 U.S. at 487-88 (citations omitted); see also Brown v. Illinois, 422 U.S. 590, 603-04 (1975) (reaffirming principle that illegally seized evidence can be admissible if the government can show that the causal chain was sufficiently attenuated by an independent act to dissipate the taint of any illegality; United States v. Ceccolini, 435 U.S. 268, 273-74 (1978) (attenuation doctrine focuses on whether connection between lawless police conduct and discovery of challenged evidence is so attenuated as to dissipate taint)(citation omitted).  Typically, the time lapse between the alleged illegal conduct and the recovery of the evidence sought to be admitted is considered, as is the presence of any intervening circumstances, and the purpose and flagrancy of the alleged misconduct.  See McMillian, 898 A.2d at 940  (admitting confession that took place hours after illegal Terry stop) (citation omitted); Brown, 422 U.S at 603-04 (same factors).

Here, the evidence which the defendant seeks to suppress was turned over to the government by the defendant's brother on January 30, 2006, nearly two months after his arrest and the alleged unlawful searches of his room.  Those items also were secured via valid legal process, namely a search warrant issued based on probable cause that did not exploit any of the information learned in the searches, and a subpoena *duces tecum*.   And, the violation alleged here was not a flagrant one.  A detective picked up a folder while talking to a juvenile who claimed to have been photographed in sexually explicit positions in the room where the police were standing.  The officer did so hoping to obtain additional identifying information about the person that the child claimed took the pictures.  Instead he found photographs that appeared to

confirm the child's story and immediately the folder was replaced and the room secured until additional investigation could be completed.  That a police officer might try to find additional information about a potential suspect in a fast-evolving investigation with a child complainant, is not at all unexpected or unreasonable.  Furthermore, any taint caused by that small intrusion was dissipated by the significant intervening 19-day investigation into the circumstances surrounding the taking - not of the unlawfully recovered pictures in the folder - but of the lawful and unrelated police possession of the CVS pictures and the defendant's request that CVS print those pictures.  On this record there is no reason to conclude that the evidence obtained was linked to any prior illegal search.

Respectfully submitted,

JEFFREY A. TAYLOR
United States Attorney

---

Julieanne Himelstein
Bar No. 417-136
Assistant United States Attorney
Federal Major Crimes
555 4th Street, NW, Room 4832
Washington, DC 20530
(202) 514-8203
Julieanne.Himelstein@usdoj.gov

**CERTIFICATE OF SERVICE**

      We hereby certify this ___ day of May 2007, that a true and correct copy of the Government's Opposition to Defendant's Motion to Suppress Evidence & Supplemental Statement of Points and Authorities, was served upon defense counsel, Danny Onorato, Schertler & Onorato, 601 Pennsylvania Avenue, NW, North Building, 9th Floor, Washington, DC 20004.

_____
Julieanne Himelstein
Assistant United States Attorney


_____
Denise A. Simmonds
Assistant United States Attorney

# SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
## SEARCH WARRANT

TO: __CHIEF OF POLICE OR ANY OTHER LAW ENFORCEMENT OFFICER__
(Specific Law Enforcement Officer or Classification of Officer of the Metropolitan Police Department or other Authorized Agency)

AFFIDAVIT, herewith attached, having been made before me by __Timothy Palchak, D2-87, Youth Division__ that he has probable cause to believe that on the __premises__ known as __135 P Street, NW (second floor apartment, first door on the left), Washington, DC__ as described more fully in the Affidavit in Support of a D.C. Superior Court Search Warrant which is incorporated herein by reference in the District of Columbia, there is now being concealed property, namely __photographic prints, photographic negatives, computers, electronic storage devices, cameras, pornographic movies, DVDs, CDs, videotapes, motorized dirtbike, computer disks, paper documents, bank receipts, bank statements, credit card receipts and statements, any other evidence relating to First Degree Child Sexual Abuse and mail matter and documents showing Andre Drew's ownership and control of the second floor apartment described above and the items contained within;__

WHICH IS __evidence of First Degree Child Sexual Abuse (22 D.C. Code Section 3008)__ and as I am satisfied that there is probable cause to believe that the property so described is being concealed on the above designated __premises__ and that the foregoing grounds for issuance of the warrant exist.

YOU ARE HEREBY AUTHORIZED within 10 days of the date of issuance of this warrant to search in the daytime, the designated __premises__ for the property specified, and if the property be found there

YOU ARE COMMANDED TO SEIZE IT, TO WRITE AND SUBSCRIBE in an inventory of the property seized, to leave a copy of this warrant and return, and to file a further copy of this warrant and return with the Court on the next Court day after its execution.

Issued this __29th__ day of __Dec.__, 20__05__    _____
                                                        Judge, Superior Court of the District of Columbia

---

## RETURN

I received the above warrant on __Dec 29__, 20__05__ and have executed it as follows: On __1/1/06__, 20__06__ at __5:45__ M., I searched the __premises__ described in the warrant and I left a copy of the warrant and return with __"Vacant Apartment"__ properly posted.
(name of the person searched or owner, occupant, custodian or person present at place of search)

The following is an inventory of the property taken pursuant to this warrant:
__No items Recovered - (Apartment Vacant)__

This inventory was made in the presence of __Det. Weeks__

I swear that this is a true and detailed account of all property taken by me under this warrant.

_____
Executing Officer

Subscribed and sworn to before me this _____ day of _____, 20____

_____
Judge, Superior Court of the District of Columbia

Form CD(17)-1055 Mar 89
9-2704 wd-234

METROPOLITAN POLICE DEPARTMENT
Washington, D.C.


AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR A
SEARCH WARRANT

FOR THE ENTIRE PREMISE OF THE FIRST ROOM ON THE LEFT ON SECOND
FLOOR OF 135 P STREET, N.W., WASHINGTON, D.C. AND A DARK COLORED
VAN WITH DC LICENSE PLATE NUMBER CG7107

An investigation by your undersigned affiant has uncovered the existence of an ongoing pattern of sexual assaults against young boys by Andre "Thomas" Drew (hereinafter "Drew" or "Thomas"). Drew is a registered sex offender with two prior convictions for Sodomy against a 15 year old and a 17 year old. Drew has been arrested and charged by Complaint in the Superior Court for the District of Columbia in F-7174-05 with two counts of First Degree Child Sexual Abuse with respect to two victims, A.B. and D.B.

On Saturday, December 10, 2005, a 13 year old boy with the initials A.B. called 911 to report that he, and a 12 year old male friend D.B., had been forcibly abducted in front of Dunbar High School in Washington, D.C. A.B. said that it occurred on December 10, 2005. A.B. said that the assailant had used a gun and that the assailant had taken both boys into his van, and then took the boys to 135 P Street, N.W. in the second floor room, first door on the left.

When interviewed by Detective Timothy Palchak on the same day, December 10, 2005, A.B. changed his story to say that the assailant, who he identified as "Thomas," had forced him and D.B. to perform oral and anal sex on each other while the assailant took photographs of the two boys. A.B. said that this occurred earlier in the day on December 10, 2005.

When questioned further by Detective Palchak, A.B. changed his story to say that the assailant did not use a gun, and then later said the assailant had not kidnapped him and D.B. A.B. was consistent throughout about the fact that the defendant had taken "nasty pictures" of him and D.B. engaged in sexual acts. A.B. was still saying that the "nasty pictures" had been taken that day, December 10, 2005.

1

Detective Palchak took A.B. to the apartment at 135 P Street, N.W., which A.B. identified as being the location where the assailant had taken the nasty pictures.

While driving A.B. to the police station, A.B. spotted the defendant driving a dark colored van. The van was subsequently stopped by police officers, and while Detective Palchak was on the scene of the stop, A.B. positively identified the defendant Andre Drew as the person who had taken "nasty pictures" of him and D.B. Palchak recorded the license plate number of the defendant's van as CG7107 (D.C.).

A police detective interviewed A.B. later on December 10, 2005 and A.B. apologized for lying in his previous stories to the police. A.B. explained that the defendant had offered $500 dollars to the two boys to engage in anal and oral sex while the defendant took photographs of them. A.B. and D.B. agreed to do so and the defendant did take photographs of these sexual acts. A.B. explained that this event took place about one month earlier in the defendant's apartment and that he had met the defendant about three years earlier. A.B. explained that he called the police on that day, December 10, 2005, because the defendant had threatened to send the sexually explicit photographs to A.B.'s mother.

A CVS Pharmacy had turned over some photographs to the police in November 2005. A CVS employee became concerned because an older black male with gray hair had submitted the photographs for processing and the photographs contained sexually explicit images of juveniles  The CVS photographs depict A.B. and another young boy, 12 year old D.B., engaged in anal and oral sex. The CVS Pharmacy also turned over surveillance footage showing the older black male with gray hair submitting the photographs for processing, and then some days later, returning to try to pick them up. Detective Timothy Palchak, your affiant, has reviewed the surveillance footage and has determined that the person submitting the photographs and the person trying to pick them up is the defendant Andre Drew.

Further investigation was done. D.B., the 12 year old boy depicted in the CVS photographs, was interviewed and he revealed that the defendant had engaged in both sex with him and A.B., and that the defendant had rubbed his penis inside D.B.'s buttocks. D.B. said that these sex acts occurred on numerous occasions.

2

D.B. corroborated A.B.'s account of meeting the defendant three years earlier. D.B. further corroborated A.B.'s account of the defendant taking photographs of A.B. and D.B. inside the defendant's apartment at 135 P Street, N.W. D.B. explained that the defendant had a scheme whereby another person would pay the defendant, D.B., and A.B. $500 each for photographs of A.B. and D.B. engaged in sexual acts. D.B. said that the defendant had two types of cameras, one which spit out photographs right after taking them and another which required the film to be processed. D.B. said that the defendant never paid the two boys the promised $500, but D.B. said that the defendant had, on prior occasions, paid A.B. and D.B. money to engage in sex. D.B. said that the defendant had told him that the defendant had a photograph of A.B. and D.B. engaged in sex acts which had been made into a card. D.B. saw the card while riding with the defendant inside the defendant's dark colored van. The defendant explained to D.B. that the card, which had a message with words to the effect of "I'm gay," was going to be sent to A.B.'s mother. This account corroborated A.B.'s story of the defendant threatening to send sexually explicit photographs to A.B.'s mother. D.B. also said that the defendant played pornographic movies for the boys inside his apartment, had allowed them to play video games at his apartment, and had given them marijuana and alcohol to consume. D.B. said that the defendant paid, in part, for a motorized "dirt bike" for D.B. D.B. had to pay for part of the cost, but the defendant contributed the majority of the payment and actually made the purchase. D.B. also described a scheme to defraud people by which D.B. and A.B. would ask people to make a donation to a school program and keep the money. The defendant assisted in this scheme by typing flyers and sign up sheets on a computer and giving them to the boys. D.B. identified a photograph of the defendant Andre Drew as the person who had engaged in sex acts with him and as the person who had taken sexually explicit photographs of him.

A 15 year old boy T.S. further corroborated the accounts of A.B. and D.B. T.S. said that he, A.B., and D.B. had met the defendant three years earlier and that the defendant had done favors for them, like giving them rides and taking them to restaurants, during that time and had taken the boys back to his apartment. T.S. said that the defendant had paid him money to engage in sex acts with the defendant. T.S. also said that he had personally witnessed the defendant engage in sex acts with A.B. and D.B. T.S. said that the defendant had provided him with marijuana and

3

had played pornographic movies for him, and that he (T.S.) had visited the defendant's apartment on numerous occasions. T.S. identified a photograph of the defendant Andre Drew as the person who had engaged in sex acts with him.

Your affiant has probable cause to believe that numerous items of evidence exist inside the defendant's apartment, which is the first room on the left on the second floor of 135 P Street, N.W., Washington, D.C. and in the defendant's dark colored van with District of Columbia license plate number CG7107, which your affiant has observed.

Specifically, your affiant has probable cause to believe that these locations contain evidence in the following forms:

**Photographic prints, photographic negatives, computers, electronic storage devices, cameras.** In addition to the foregoing investigation which has revealed that the defendant has taken pornographic photographs of children, your affiant knows from his training and experience that offenders who engage in sex with children and produce child pornography like to keep and collect child pornography. Such pornography is often a sex offender's most prized possession. Child pornography can be stored on photographic print paper, photographic negatives, in electronic storage devices like disks, chips, "thumb drives," and in computers themselves. These images can also be stored in cameras themselves. Photographs taken with traditional cameras can be processed and stored in electronic form or, when processed, can be scanned into electronic form.

**Pornographic movies, DVDs, CDs, videotapes.** In addition to the fact that child victims in this case have stated that the defendant played pornographic movies for them, and that such evidence would be important corroboration of their accounts, such material would also show the defendant's "grooming" techniques. In your affiant's training and experience, child sex offenders often ingratiate themselves to their victims by giving them things appealing to children. Pornography is often appealing to adolescents and showing it can help make the experience of visiting an offender's home pleasurable, such that the adolescent would want to return. These materials may also constitute "obscenity," that is, adult pornography not suitable for minors, and dissemination of obscenity is a crime in the District of Columbia.

4

**Motorized dirtbike.** This item is evidence of the defendant's reward given to D.B. for engaging in sex with the defendant. It was seen in the defendant's dark colored van.

**Computer disks, electronic storage devices, paper documents, bank receipts, bank statements, credit card receipts and statements.** D.B. described a scheme by which the defendant was helping D.B. and A.B. to defraud people using fake fundraising papers. This scheme was another benefit conferred upon the boys which helped the defendant entice the boys into having sex with him. All three child victims also describe being paid money by the defendant to engage in sex. Evidence of the defendant's cash withdrawals and access to funds would provide evidence of the defendant's efforts to entice the boys to engage in sex.

_____     _____
Affiant                              Assistant United States Attorney

Subscribed and sworn to before me this _____ day of _____, 2005

p. 5