## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL NO.  07-007 (GK)** |
| | : | |
| **v.** | : | |
| | : | |
| **ANDRE DREW** | : | |

### GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING

The United States, by and through its attorney, the United States Attorney for the District of Columbia,  respectfully submits this memorandum in aid of sentencing.

### I.  BACKGROUND

The defendant comes before the Court for sentencing on one count of Enticing A Minor to Engage in Sexual Conduct for the Purpose of Production, in violation of 18 U.S.C. § 2251(a) and one count of First Degree Child Sexual Abuse, in violation of 22 D.C. Code § 3008.  The facts underlying those offenses are as follows:

On December 10, 2005, 13-year-old A.B. called 911 and reported that he, and a 12-year-old male friend, D.B., had been abducted at gunpoint in front of Dunbar High School in the District of Columbia.  A.B. said that they were taken to 135 P Street, N.W., to a room on the second floor, whose door was the first one on the left.  There, he claimed that they were forced to perform oral and anal sex on each other while their abductor took photographs.  However, upon further questioning, A.B. admitted that he had not been abducted, but he maintained that a man that he knew for three years, named Andre Thomas Drew, took pictures of him and D.B. engaged in sex in the room located at 135 P Street, N.W.  A.B. explained that the defendant offered to pay him and D.B. $500 each if they engaged in sex so that the defendant could take pictures of them.

1

They agreed and about one month earlier (sometime in November 2005), they went to the defendant's room at 135 P Street, N.W., where they engaged in sex while the defendant took pictures. A.B. said that he called the police on December 10, 2005, because the defendant was going to mail the sexually explicit photograph's to A.B.'s mother.

A.B. showed the police the defendant's room and he gave them a physical description of the defendant and the defendant's car. As A.B. was being taken to the police station, A.B. saw the defendant drive by in his car and he pointed the defendant out to an officer. The car was stopped and A.B. identified the defendant -- the sole occupant of the vehicle -- as the person who took the sexually explicit pictures of him and D.B.

The defendant was taken back to 135 P Street, N.W., where he verbally and in writing consented to a search of his room. After he verbally consented to the search, but before he signed the form, the defendant handed a police officer a brown folder, stating "this is what you are looking for," or words to that effect. The officer, who previously had seen the folder, told the defendant that he should wait until he signed the consent form. The defendant signed the form and the police retrieved the brown folder, which contained photographs of A.B. having anal and oral sex with an adolescent male, later identified as D.B. These photographs had the background cut away from the figures.

During that investigation, the police also realized that A.B. was one of the boys in a set of sexually explicit photographs that a local CVS had given to the police in November 2005, and that the defendant was the man on the surveillance videotape submitting the film for processing and attempting to retrieve the prints. The name printed on the film processing envelope was

2

"Thomas Caclin" and the telephone number listed was 410-320-2158.[1]

The defendant was arrested and transported to the police station. There, he was read his Miranda rights and he signed a waiver of those rights agreeing to speak to the police without an attorney. During that interview, the defendant told the police that he took the pictures that were developed at CVS. He said that about a month before his arrest, he took the pictures of the boys engaging in oral and anal sex inside his room at 135 P Street, N.W. He said that he submitted the film for processing, but the store would not allow him to pick up the prints. The defendant identified the boys in the CVS photographs by their first names, which are consistent with the names of A.B. and D.B.

About five days after the defendant was arrested, the police interviewed 12-year-old D.B. He told the police that he knew "Thomas" for about three years and had sex with him on a number of occasions. D.B. said that sometimes, after they had sex, "Thomas" gave him money. D.B. also said that "Thomas" had sex with A.B. When asked about the CVS pictures, D.B. stated that "Thomas" asked A.B. and D.B. to have sex with each other while he took pictures of them. "Thomas" promised to pay them $500 each for the pictures, but he did not pay them. D.B. also corroborated A.B.'s claim that "Thomas" intended to send the sexually explicit pictures to A.B.'s mother. D.B. said that he saw the card containing the pictures in "Thomas'" car.[2] He also told the police that "Thomas" bought him a dirt bike; helped him to concoct a phoney

---

[1] Further investigation revealed that the telephone number listed on the CVS film processing envelope was only one digit off from the defendant's actual telephone number, 410-370-2158, which D.B. said he used to contact the defendant.

[2] When the defendant was stopped on December 10, 2005, the sexually explicit card was found in the defendant's car. The pictures in the brown folder that the defendant gave to the police during the consent search of his room, appear to have been used to produce that card.

school fund raising scheme in which D.B. would keep the money;[3] allowed him to play video games; showed him pornography; and gave him marijuana and alcohol to consume. D.B. said that he spent the night with "Thomas" and had sex with him as recently as one month before being interviewed. On December 19, 2005, about four days after the police interviewed D.B., they showed him a single photograph of the defendant. Without hesitation, D.B. stated, "yes, that's him," identifying the defendant as the person that he knew as "Thomas."

## II. SENTENCING CALCULATION

A.    Statutory Maximums

 Count 1 - Pursuant to Title 18, United States Code, Section 2251(a) carries a minimum sentence of 25 years, and a maximum sentence of 50 years in prison, a fine of $ 250,000, and a maximum term of supervised release up to life.   See 18 U.S.C. §§ 2251(e), 3571(b)(3), 3583(k).

Count 2 - Pursuant to Title 22, District of Columbia Code, Section 3008 carries a minimum sentence of 7 years (because the defendant previously was convicted of a crime of violence) and a maximum sentence of life in prison, although the Court may  impose a prison sentence in excess of 30 years only if the government filed notice of aggravating circumstances pursuant to 22 D.C. Code § 3020, which it has not done, or in accordance with 24 D.C. Code § 403.01(b-2).   See 22 D.C. Code §§ 3008, 3020 and 24 D.C. Code § 403.01(b-2) and (e).  The maximum fine is $250,000 and the maximum term of supervised release shall not be more than 10 years.   See 22 D.C. Code § 4002(a) and 3008.

---

[3] Copies of the fund raising flyers were recovered from the brown folder that the defendant handed to the police during the consent search of his room.

B.    Sentencing Guidelines Calculation

Count 1 - The Guidelines calculation utilized in the Presentence Report ("PSR")

calculates the defendant's total offense level at 39.  See PSR ¶ 40.  (This calculation

contemplates a three level enhancement for multiple victims.) The PSR calculates the

defendant's criminal history score as 9 and his criminal history category as IV.  See PSR ¶ 54.

The guidelines range for the defendant is calculated at 360 months to life.  See PSR ¶ 90.   For

the reasons set forth, infra Section III of this Memorandum, the government respectfully

recommends that the Court sentence the defendant to 50 years of imprisonment .

Count 2 - the Guidelines calculation utilized in the PSR calculates the defendant's

criminal history score as 4.5, resulting in a criminal history category "D."  First Degree Child

Sexual Abuse also is a Group 3 offense.   See PSR ¶¶ 56, 93.  The District of Columbia

guidelines range for the defendant is calculated at 126-216 months.  See PSR ¶ 93.  For the

reasons set forth, infra Section III of this Memorandum, the government respectfully

recommends that the Court sentence the defendant to 216 months (or 18 years) of imprisonment.

## III. GOVERNMENT'S RECOMMENDATIONS

A.    Acceptance of Responsibility

The defendant does not accept responsibility for his conduct underlying the charges for

which he has been convicted.

B.    Application of the Federal Guidelines post-Booker

It is the government's position that the Court should impose a sentence within the

guidelines range.  In United States v. Booker, 125 S. Ct. 738 (2005), the Supreme Court held that

the mandatory application of the United States Sentencing Guidelines violates the Sixth

Amendment principles articulated in <u>Blakely v. Washington</u>, 124 S. Ct. 2531 (2004). As a consequence, the Court invalidated the statutory provision that made the Guidelines mandatory, Title 18, United States Code, Section 3553(b)(1). <u>Booker</u>, 125 S. Ct. at 756. However, the Court expressly refused to invalidate the Guidelines in their entirety. To the contrary, the Court upheld the remainder of the Guidelines as the most appropriate benchmark for informing courts as to the most reasonable sentence for a particular defendant who has committed a particular crime. Indeed, it remains the case that if the sentencing court imposes a sentence that is outside the range as set forth in the Guidelines, the Court must state in a written order of judgment and commitment the specific reason for the imposition of a sentence different from that described in the Guidelines. <u>See</u> 18 U.S.C. Section 3554(c)(2). The sentence will then be subject to review by courts of appeals for "reasonableness." <u>Id.</u> at 769.

        In <u>Booker</u>'s wake, this Court must continue to resolve disputed questions of fact and law and correctly calculate a defendant's sentence under the existing Sentencing Guidelines. <u>See</u> Fed. R. Crim. P. 32(i)(3)(B) (court must rule on unresolved objections to the Presentence Report or determine that resolution not necessary to sentencing). "The district courts, while not bound to apply the Guidelines, must consult those Guidelines and take them into account when sentencing." <u>Booker</u>, 125 S. Ct. at 767 (citing 18 U.S.C. Sections 3553(a)(4)&(5) (Supp. 2004)). In light of this mandate – and the continued requirement of written explanations for sentences that fall outside of the range called for by the Guidelines and the new standard of "reasonableness" review – it is plain that a sentence within the Guidelines, while not required, is reasonable <u>per se</u>. Not only is a sentence within the Guideline range reasonable <u>per se</u>, but it also accommodates the goal, endorsed by both Congress and the Supreme Court, of meting out fair

and uniform sentences.

The Guidelines, aiming to achieve the uniform and appropriate treatment of like crimes, represent the distillation of two decades of careful study of sentencing practices across the country, and correlate as well to the varying severity of crimes as defined by Congress.  The Guidelines, consisting of offense characteristics and various grounds for departure, address the considerations relevant to sentencing, as articulated in 18 U.S.C. Section 3553(a), such as "the nature and circumstances of the offense and the history and characteristics of the defendant"; "the need for the sentence imposed -- (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner"; and "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."

Indeed, the Sentencing Commission formulated the Guidelines only after initially canvassing prior sentencing practice and attempting to identify and assign weights to all the factors – both aggravating and mitigating – that judges traditionally used in determining an appropriate sentence.  See United States Sentencing Comm'n, Supplementary Report on the Initial Guidelines and Policy Statements 16-17 (1987); see also 28 U.S.C. Section 994(m) (requiring Commission to "ascertain the average sentences imposed . . . prior to the creation of the Commission"); Comprehensive Crime Control Act of 1984, S. Rep. No. 98-225, at 168 (Commission should produce a "complete set of guidelines that covers in one manner or another

all important variations that commonly may be expected in criminal cases").  Moreover, since the Guidelines were adopted, the Sentencing Commission has continued to study district court and appellate sentencing decisions and to "modify its Guidelines in light of what it learns."  Booker, 125 S. Ct. at 766; see id. at 767 (Sentencing Commission will continue "collecting information about actual district court sentencing decisions  . . . and revising the Guidelines accordingly").

It thus remains true that, absent unusual circumstances, the sentence in a criminal case should fall within the Guideline range as determined by this Court.  Each Supreme Court Justice in the various opinions in Booker recognized the express national policy goals, as articulated by Congress, that sentences be uniform across the country, to the extent possible, and that sentences be based on the offender's actual conduct and history.  See, e.g., id. at 761 (majority opinion of Breyer, J.) ("Congress' basic goal in passing the Sentencing Act was to move the sentencing system in the direction of increased uniformity."); id. at 759 (same) ("Congress' basic statutory goal -- a system that diminishes sentencing disparity -- depends for its success upon judicial efforts to determine, and to base punishment upon, the *real conduct* that underlies the crime of conviction."); id. at 783 (dissenting opinion of Stevens, J.) ("The elimination of sentencing disparity, which Congress determined was chiefly the result of a discretionary sentencing regime, was unquestionably Congress' principal aim."); id. at 789 (dissenting opinion of Scalia, J.) ("the primary objective of the Act was to reduce sentencing disparity.").  Since the Guidelines currently represent the only extant benchmark to encourage uniformity and thus the only tool to implement Congress' vision of sentencing uniformity and fairness, Guideline range sentences are currently the only mechanism available to implement Congress' basic statutory goals.

Booker, to be sure, departs from the prior practice of automatic reversal that would have

8

accompanied the failure to sentence a defendant within the Guidelines.  Such a sentence will now

be reviewed instead for its "reasonableness."  See Booker, 125 S. Ct. at 764.  Nevertheless, the

Guidelines -- resulting as they do from years of study of sentencing practices, crime statistics,

national crime policy, and consideration of the factors that inform sentencing, see 18 U.S.C.

Section 3553(a) – provide the most concrete yardstick against which to measure what would be

unreasonable.  Booker not only prevents courts from substituting their individual judgment about

the appropriateness of the Guidelines range without explaining with specificity their reasoning,

Booker also continues to subject the explanation of the decision to sentence outside of the

correctly calculated range to a court of appeals reasonableness review.  See 18 U.S.C. Section

3553(C) (mandating consideration of the Guidelines); 18 U.S.C. Section 3553(c)(2) (mandating

written explanations for imposing a sentence outside of the applicable Guideline range); 18

U.S.C. Section 3742(f)(1) (mandating court of appeals to set aside a sentence imposed as a result

of an incorrect application of the Guidelines); 18 U.S.C. Section 3742(f)(2) (mandating court of

appeals to set aside a sentence outside the Guidelines range when the district court fails to

provide a required statement of reasons in the judgment and commitment order).

Fidelity to the Guidelines best accomplishes the purpose of fair and consistent sentencing

and should occur absent unusual circumstances.  This is so, said the court in United States v.

Wilson, 350 F. Supp. 2d 910 (D. Utah, 2005) – the day after Booker was decided – because the

Guidelines represent the product of an expert commission, that has studied the sentencing

process at great length, under the specific mandate of Congress, to fashion recommended

sentences that carry out the purposes defined by Congress.  The resulting Guidelines, Wilson

held, plainly reflect the public's will, as expressed by their democratically elected

representatives, in that Congress has repeatedly approved of the Guidelines or acted to adjust them to congressional preference.  Wilson further observed that guided sentencing appears to have had a positive impact in deterring criminal conduct throughout the country, and thus serves the purpose of deterrence as well as punishment and fairness.  For all of these reasons, Judge Cassell determined that "the court will give heavy weight to the Guidelines in determining an appropriate sentence.  In the exercise of its discretion, the court will only depart from those Guidelines in unusual cases for clearly identified and persuasive reasons."  Id. at 912.  A non-Guidelines sentence would, in the ordinary or usual case, unreasonably thwart legislative intent – in particular, the overriding concern with uniformity and the prevention of unfair disparities for similarly-situated defendants.

In this case, as explained further below, no unusual circumstances exist that warrant an exception to the preference for guideline sentencing.  Therefore, the government respectfully recommends that the Court sentence the defendant within the Federal Guidelines range calculated in the Presentence Report, in addition to the imposition of sentence for the D.C. offenses.

        C.    Basis for Government's Sentencing Recommendation

 The government is requesting a sentence at the top of the defendant's federal and District of Columbia guidelines ranges.   Such a sentence is more than supported by:  (1) the facts surrounding defendant's offenses, (2) the defendant's criminal history, and (3) the significant risk of danger to children and the community that the defendant's violent and sexually predatory conduct poses.

        1.    This Offense

The defendant has been convicted of one count of Enticing a Minor to Engage in Sexually Explicit conduct for Purposes of Production and one count of First Degree Child Sexual Abuse for causing D.B. to engage in explicit sexual acts with A.B. so that the defendant could photograph them.  The photographs that were admitted into evidence in the case are some of the most graphic and disturbing images that the government has viewed.  They involve pre-pubescent boys, naked but for their filthy socks, with ashen knees and uncombed hair, posing on the defendant's bed, in the defendant's bedroom at a rooming house, in various poses involving oral- and anal-penile penetration.  In other photographs, the boys are seen naked and embracing or sprawled across the defendant's bed while using their hands to spread open their buttocks so that the defendant can photograph their anus.  The images in the photographs exploit and demean the vulnerable boys depicted in them.  And, they are a testament to the defendant's selfish desires to satisfy his unusual sexual appetite for teenage boys at the expense of the best interests of the children that were involved.

That the defendant took these photographs is indisputable.  He was captured on film at the CVS submitting them for development and attempting thereafter to collect them.  Moreover, although it was not evidence that was presented to the jury, the defendant admitted when he spoke to the police and was shown the CVS pictures, that indeed he had taken them about one month prior to his arrest.  The defendant offered two explanations for why he took the photographs.  First, he blamed the children.  He claimed that the boys asked him to take the pictures.  On its face, that attempt to cast blame on the victims was preposterous since no adult – who was not a child sexual predator – would agree to take photographs of children having sex and invite them to his room to do so.  The defendant also claimed that he intended to use the

11

pictures as evidence to show the children's parents what they were doing. That explanation was only partially true because the disclosure really was a form of blackmail intending to out A.B. to his mother as gay unless A.B. returned money that the defendant incorrectly believed that A.B. had stolen from him. Evidence of the blackmail scheme was found in the defendant's car and in his room. Specifically, a handmade card and envelope were recovered from the defendant's car when he was arrested. (Undersigned counsel will submit in open court.) D.B. had seen that card. The envelope was addressed to "Mom" at A.B.'s home address. Inside of the envelope was a handmade card. On the cover of the card was a picture of A.B. smiling and the caption,"Hey Mom...! I'm not just HAPPY...." Inside the card the caption continued, "I'm gay...[,]" and included two pictures of A.B. and D.B. engaged in oral and anal sex, their naked figures having been cut away from the background of the photographs. The items used to make the card were found in a brown folder that the defendant turned over to police as part of a consensual search of his room following his arrest. (Undersigned counsel will submit in open court.) That folder contained the text from the card that apparently was printed from a computer and cut out. It also contained several graphic images of A.B. and D.B. engaged in sexually explicit conduct. (Undersigned counsel will submit in open court.) These images had been cut away from the background of the photographs, were thicker than the CVS pictures, and were backed with a heavy black paper typically found in Polaroid pictures. These cut-away-images tend to further corroborate D.B.'s claim that the defendant took two sets of sexually explicit pictures of the boys: one with a disposable camera and the other with a camera that immediately printed the images. That the defendant intended to blackmail A.B. using the photographs undercuts any professed altruistic purpose for the pictures and highlights the defendant's efforts to control and

exploit the boys that he was molesting.

Finally, the photographs represent the culmination of an ongoing pattern of sexual abuse of D.B. by the defendant. For months the defendant had been grooming D.B. He gave D.B. gifts and told him that he loved him and wanted to adopt him. He showered D.B. with attention and affection, kissing him on the neck, mouth and cheek. By all of the other children's accounts, D.B. became the defendant's favorite child and the person with whom the defendant had the most sexual contact. According to D.B., and other boys, the defendant placed his mouth on D.B.'s penis and D.B. placed his mouth on the defendant's penis. On other occasions, the defendant placed grease in D.B.'s buttocks and rubbed his penis in D.B.'s buttocks. He also placed his penis in D.B.'s buttocks just below D.B.'s anus and rubbed it there, although according to D.B., the defendant did not penetrate him. The oral and anal sexual contacts took place in the defendant's home and in his car in public places, such as behind a liquor store in Southeast, Washington, D.C., when the defendant was supposed to be dropping D.B. off at home. The defendant showed D.B. pornography and engaged in sexual acts with him while they watched pornography together. Sometimes, the defendant climaxed during these sexual encounters ejaculating onto D.B.'s back and buttocks. The defendant also encouraged D.B. to leave his mother's house and to spend the night with the defendant without permission. According to D.B., during the overnight visit, the defendant gave him pajama pants to sleep in and he slept in the same bed with the defendant. The defendant gave D.B. alcohol to drink and marijuana to smoke -- as he had done on many prior occasions -- and they engaged in oral sex as well as the type of anal contact stated above.

Through these selfish, self-gratifying acts, the defendant stole D.B.'s childhood,

humiliated him, and diminished his feelings of self-worth.  While therapy and the passage of time may help D.B. to learn to live with his victimization, nothing can be done to erase what has happened to him.  Nothing can be done to restore what has been taken from D.B. by the defendant's destructive acts.  And, no one can quantify what the future effects of the defendant's abuse of D.B. will be.   The life of a child -- D.B.'s life -- has been permanently changed because of the defendant's destructive choices and for that, the defendant should be punished.

      2.    <u>Defendant's Criminal History</u>

The defendant's criminal history is lengthy.  It begins in 1967, spans five jurisdictions, and includes multiple allegations of sexually brutal offenses and several periods of incarceration. He also has been arrested for, or has admitted to engaging in, other criminal conduct that did not result in a conviction.  According to the information contained in the PSR, the defendant has fourteen previous arrests, twelve prior convictions, and his parole has been revoked three times. At least three of the defendant's prior convictions are for crimes of violence, which suggests that he poses a significant danger to the community.

Notably, the defendant has been committing sexual offenses since he was a very young boy.  Although he never was prosecuted for it, the defendant admitted in a 1999 Johns Hopkins interview that at the age of 5 he fondled a toddler, at 10 he fondled a male over clothing, and at 11 he began sexually molesting his 7-year-old brother and he did so for three years and then sporadically over subsequent years.  At the age of 16, the defendant raped a fellow Job Corps participant and was convicted of Assault with a Dangerous Weapon ("ADW").  At 26, he again was convicted of ADW.  That conviction arose out of an alleged sexual assault in which the defendant bound, gagged, brutally raped, and photographed clothed and naked, a teenaged boy

who ultimately escaped, with his hands still bound behind his back, via a window ledge to an adjoining apartment.  At the age of 33, the defendant brandished a badge, pretended to be a police officer and  kidnapped, bound, raped and brutally beat a teenage boy that he purported to arrest. Upon his conviction in that case for Kidnapping and Sodomy, the defendant admitted during his pre-sentence evaluation that he had committed that type of offense about a dozen times without getting caught.[4]

Even a cursory review of the defendant's criminal record demonstrates that incarceration has had no rehabilitative affect upon him because he continues to re-offend and specifically, he continues to commit violent sexual offenses.  Accordingly, the governments submits that the Court now must focus upon the safety of the community in determining what period of incarceration to impose.  The government believes, as set forth below in subsection 3, that the defendant is a dangerous sexual predator who will offend again if released and it urges the Court to incarcerate the defendant for 50 years on Count One and no less than 216 months on Count Two.  Such a sentence will ensure the safety of the community, especially its children.

3.    Defendant's Dangerousness

The government submits that the defendant is a dangerous sexual predator who will offend again if he is released.  The government bases that contention not only on the defendant's prior commission of violent sexual offenses and the circumstances of the instant crimes, but also upon the information that it obtained during its investigation of the instant offenses.

What became evident to the government through its investigation is that the defendant at

---

[4]  The Court should have received letters from the victim and his parents concerning the Kidnapping and Sodomy offenses.  Moreover, that victim's parents attended the entire trial in this case.

15

some point realized that continuing to offend using force exposed him to potential arrest and incarceration. Instead, he began to identify and to groom compliant victims, that is children who would cooperate in their own victimization and not disclose. What emerged from the government's conversations with many children who had contact with the defendant, was that the defendant had a very deliberate and calculated manner in which he was able to coax boys into his home and car where he molested them and most of them did not disclose the molestation. Indeed, the defendant was so successful at making D.B. complicit in his own molestation, and the defendant's molestation of other boys, that it is unlikely that D.B. ever would have disclosed on his own. The frightening pattern that emerged during the government's investigation can be summarized as follows:

First, the defendant selected housing where boys were abundant. The defendant's apartment at Saratoga Avenue, N.E., was located next to and shared a parking lot with the local Boys & Girls Club. On P Street, N.W., he lived across the street from one school and around the corner from another one. A public library and recreation center, places his child victims told us the defendant frequented, were within walking distance of his home on P Street.

Second, he searched for unsupervised boys at inner-city gas stations and car washes -- sometimes going there daily to pick them up. These boys appeared to fit a profile that the defendant developed of the kind of boy who might be receptive to his advances. He tended to focus on pre-teen to teen, black males, who were child-like in appearance. The boys lived in the inner-city, usually in single parent (maternal) homes. Consequently, many of the boys yearned for the attention of an adult male. The boys presence at the gas station also seemed to be an indicator of two important characteristics for the defendant: (1) that the boys lacked parental

supervision and (2) they were interested in earning money and probably would be receptive to material rewards.  The defendant would test the boys by offering them money to wash his car or to pump his gas.  Eventually he offered to take them for rides to determine whether they would be receptive to leaving the gas station with him.

Third, the defendant befriended the boys, encouraging them to trust him and to view him as a peer.  He earned their trust by engaging in child-like conversation and play with them.  The defendant also owned and playing with toys and games that appealed to boys, such as video games.  He  created a home environment that was enticing to young boys.  There were no rules or boundaries in the defendant's home.  Boys could play video games there for hours and drink alcohol and smoke marijuana – sometimes provided by the defendant and consumed by him along with the boys.  He bought some of the boys food, clothing, and gifts (e.g., cellular telephone, motor bike).  He took them on trips (e.g., go-kart track) and was an available source of transportation (e.g., movies).   He helped them to concoct fraudulent schemes to make money (e.g., flyers to solicit money for non-existent school teams).  The defendant also used the boys to access other children, by encouraging them to bring their friends to his home.

Fourth, the defendant capitalized on the natural curiosity of pubescent boys in sex and he diminished their inhibitions about sex and nudity by showing them pornography and playing strip poker with them, sometimes while giving them alcohol and marijuana to consume.

Fifth, he encouraged the boys to defy their parents (e.g., sleep over without permission) while he simultaneously lavished them with praise, flattered them about their specialness, told them that he loved them, referred to them as his "sons," and promised to adopt them.

Finally, he sexually molested some of the boys.  Some of the boys were kissed.  If they

17

ran away, told or otherwise indicated that they were not receptive, the defendant apparently did

not attempt to force them to submit.  The boys who were receptive, however, were groomed

further.  The defendant showed them pornography, played strip poker with them, and he began to

caress them.   Eventually, the defendant placed his mouth on the penis of some boys and his

penis between their greased buttocks cheeks.  He caused some boys to place their mouths on his

penis.  Sometimes the boys climaxed and sometimes the defendant climaxed ejaculating onto the

buttocks and backs of the boys.  By sexually assaulting the boys in front of each other or causing

them to have sex with each other, the defendant made his victims complicit in their -- and their

friend's -- molestation, which ensured that the defendant could control the boys (e.g., fear of

being outed as gay) and reduced the possibility that they would disclose.

        What this detailed sequences of events showed the government is that the defendant is not

an opportunistic offender who has poor impulse control.  Rather, the defendant's methodical

approach to molestation demonstrates that he is a sexual predator.  His approach reflects careful

planning, patient selection of a group of potential victims, identification of the vulnerable

individual(s), and extensive grooming of those individuals into submission and silence.  It is the

defendant's uncanny ability to appear non-threatening and to ingratiate himself with boys that

makes him particularly dangerous to unsuspecting or vulnerable children.  Those characteristics

also permit him to assimilate into any community where he can offend undetected.

        Indeed, the scope of the defendant's dangerousness is exemplified by the fact that he did

not limit his predatory conduct to the District of Columbia.  The government's investigation

showed that the defendant had been traveling to Baltimore City to source potential victims.  The

government met two boys from Baltimore City, and heard about others, whom the defendant

befriended at a local gas station/car wash.  Within minutes of meeting the defendant, these boys –

some as young as seven years of age – got into the defendant's car and went with him for drives

around Baltimore.  The defendant returned to Baltimore on other occasions and took the boys to

the park where he gave them beer to drink and marijuana to smoke while he let them watch

motocross in the park.  The defendant also took some of the boys from Baltimore City and

brought them to the District of Columbia without their parents' knowledge or permission.  The

defendant took one of those boys, K.T. who testified at trial, from Baltimore City and brought

him to the District of Columbia on several occasions where he gave K.T. alcohol and marijuana

to consume.  On one such occasion, the defendant did not take K.T. home.  Instead, K.T. slept at

the defendant's home without the defendant notifying or obtaining permission from K.T.'s

parent.   According to K.T., the defendant gave him large quantities of alcohol to drink and

marijuana to smoke, such that K.T. remembers feeling very intoxicated.  On the way back to

K.T.'s home, the defendant helped K.T. to concoct a false story to tell his mother about where he

had been.  The defendant also gave K.T.'s mother a false address in Baltimore where she could

pick up K.T., but when she got there the building was abandoned.  When the defendant finally

arrived at K.T.'s home, his mother confronted the defendant and told him never to come near her

child again.  The defendant ignored that admonition.  The next day, he parked at the top of K.T.'s

block, called K.T. on the cellular telephone that he had given to K.T., convinced K.T. to come

outside, and attempted – unsuccessfully – to convince K.T. to travel from Baltimore to the

District of Columbia with him.

      The government finds the defendant's interstate transportation of children and his

defiance of K.T.'s mother particularly disturbing and chilling for several reasons: (a) it shows the

defendant's willingness, essentially, to kidnap children; (b) it demonstrates the ease with which he was able to take them; (c) it reflects an increase in the type of risky behavior in which the defendant was willing to engage to locate potential victims; (d) it reflects a level of boldness and self-assurance on his part that he would not be caught or that he would be believed over the child, if confronted; and (e) it shows that the defendant's compulsion to associate with certain boys at times can be so overwhelming that not even his natural defenses of self-preservation and the prevention of detection may prevent him from offending.

These overt acts that were designed to provide the defendant with access to boys are only part of the mosaic of his character that makes him dangerous. Among the defendant's personal belongings that the government collected, there were several notebooks and scraps of paper with numerous lists of pornographic web sites. The government viewed some of the listed web sites and many contained homosexual erotica and real or simulated sex acts with what appeared to be pre-teen and teenaged boys. Some of the notebooks also contained handwritten poems and sexually graphic drawings. While the government realizes that the mere possession of these items is not indicative of dangerousness, it raises them with the Court because sexual predators often use pornography and stories to fantasize. Those fantasies, when coupled with grooming and ready access to victims, may cause an individual to offend. Thus, we submit that the defendant's possession of such items is a factor to be considered in determining whether he presents a greater risk for re-offending.

**IV.CONCLUSION**

Wherefore, the government respectfully requests that the Court sentence the defendant to

50 years of imprisonment on Count One and to 216 months on Count Two.

                                     Respectfully submitted,


                                     JEFFERY A . TAYLOR
                                     United States Attorney
                                     Bar No. 498610


                                     _____

                                     JULIEANNE HIMELSTEIN
                                     Assistant United States Attorney
                                     Major Crimes Section, Mass.  Bar No. 417-136
                                     DENISE A. SIMMONDS
                                     Assistant United States Attorney
                                     Sex Offense Section, D.C. Bar. No. 437-960
                                     555 4th Street, N.W.
                                     Washington, DC 20001
                                     Phone: 514-8203
                                     Fax: 353-9414




                        CERTIFICATE OF SERVICE

        I HEREBY CERTIFY that I caused a copy of the foregoing to be served upon the attorney
for the defendant, this 4th day of September, 2007.


                                     _____

                                     JULIEANNE  HIMELSTEIN
                                     Assistant United States Attorney